The Denver and Swansea Railway Company et al.     2 | 673
    *v.* The Denver City Railway Company.                3 | 243

Corporation —*whether its existence may be collaterally questioned.* Upon a
bill between corporations to restrain the defendant from unwarrantably
interfering with the rights, privileges and property of the complainant,
upon charges preferred by each against the other, the successive steps in
the organization of each will not be investigated for the purpose of deter-
mining whether the corporations legally exist. Such charges may be
more properly investigated in a proceeding by *quo warranto.*

*Of the right to inquire into the grant of franchise.* The rights, privileges and
franchises claimed by each of the corporations are, however, a proper sub-
ject of inquiry in such suit.

*Who may grant a franchise.* The right to construct and operate a street rail-
way in a city, and to take tolls from persons traveling on the same, is a
franchise which the sovereign authority alone can grant.

*Of the power of the legislative assembly.* Under the acts of congress of 1867
(14 Stat. at Large, 426) and 1872 (17 Stat. at Large, 390 ; R. S., U. S., 333)
the legislative assembly cannot grant the right to construct and operate a
street railway in a city, except by general law.

*Semble,* that the general law of the Territory, relating to corporations (R.
S. 117) does not provide for granting such right, and no right to construct
and operate a street railway can be acquired under it.

*Of the power of the corporation of Denver.* In the years 1873 and 1874, the
corporation of Denver could not grant to individuals or a corporation a
special privilege or franchise of constructing and operating a railway in
the public streets of the city, because —

1st. The legislative assembly, from which the city received its authority, had
not, at that time, any such power.

2d. In the general power over the streets of the city, which was conferred by
the charter of 1866 (5 Sess. 95) no such authority is given.

3d. If the charter of 1874 (10 Sess. 269) was intended to confer such power,
the legislative assembly exceeded its authority, and the act is, in that par-
ticular, void.

*Of the Denver City Horse Railroad Co.* The act to incorporate the Denver City
Horse Railroad Company (6 Sess. 105), passed before any restriction was
put upon the legislative assembly in respect to corporations, is valid.

The exclusive right to construct and operate a horse railway in a city is not
infringed by constructing a road in the same city, to be operated by steam.

*Whether a railway in a street is a nuisance.* A railway constructed in a public
street of a city, without authority of law, is a continuous obstruction,
which amounts to a public nuisance.

*When equity will enjoin.* For an injury which an individual or corporation
suffers in common with the public generally, equity will not relieve.

Vol. II.—85

A steam railway in a street in Denver, which is not occupied by complainant, although in itself a public nuisance, and intended for carrying passengers in the manner pursued by complainant, is not a special injury to complainant's road which equity will enjoin.

An unauthorized interference with complainant's lines of road in actual operation, and one which complainant was engaged in building for the purpose of constructing such steam railway, is a special injury to complainant, which equity will enjoin.

## Error to District Court, Arapahoe County.

THE bill was filed by the Denver City Railway Company against the Denver and Swansea Railway Company, Miers Fisher, Charles Ruter, and John G. Perrenoud. It alleged that complainant was a corporation under an act of assembly approved January 10, 1867 (6 Sess. 105), which was set out in the bill. The provisions of the act are given in the opinion. Complainant claimed an exclusive right under said act to construct and operate railways in the city of Denver, for transporting passengers for hire. The bill also alleged that complainant had constructed several lines of railway in Denver, and was about to extend its road on Twenty-third street, from the intersection of Champa street, in a south-easterly direction ; that complainant had already a road built, and in operation, on Champa street, and that, on the 18th day of June, 1874, it commenced work on Twenty-third street, with a view to building a road on that street ; that, after some progress had been made in the work, the defendants, Ruter, Fisher and others, pretending that there was such corporation as the Denver and Swansea Railway Company, and that it had a right to build a road in the same place, interfered with the work, and obstructed the complainant, etc. The ordinances of the city council, which are mentioned in the opinion, were also set out, and it was averred that defendants were building a road on Holladay street, and that they proposed to build one on Fifteenth street, on which complainant already had a line of road built, and in operation. It was also averred that defendants had not complied with the ordinances of the city, and that the work done by them was without authority

of law, and a public nuisance. Complainant prayed that defendants be enjoined from doing the wrongful acts mentioned, and from building and operating any road upon any of the streets mentioned.

The answer, admitting some and denying other allegations of the bill, it is not necessary to state at length. It alleged that the Denver and Swansea Company was duly incorporated under the general law of the Territory, on or about April 26, 1873. It averred that the city owned the streets in fee, and relied upon the ordinances which were mentioned in the bill. Defendants averred that the Denver and Swansea company had purchased a large amount of material for a road, and was engaged in building such road on Holladay and Twenty-third streets; that the said company might at some time construct a road on Fifteenth street. The alleged interference with complainant's operations, as charged in the bill, was not denied. Before the master some evidence was taken relating to the organization of each of the corporations, which the court declined to notice. It was shown that the Denver and Swansea company had constructed half a mile or more of road on Holladay and Twenty-third streets, and that at the intersections of Champa and Twenty-third streets it would be necessary to cross the complainant's road. At this point, complainant commenced to build a road south-easterly on Twenty-third street, and soon came in collision with the workmen of the defendant corporation. It was also shown that the defendant's road was intended to be operated by steam. The court decreed that the defendants be restrained, and perpetually enjoined from in any manner obstructing and preventing the complainant from building, constructing and operating its railway on Twenty-third street, and from removing any obstructions in said street which interfered with the construction and operation of the complainant's railway on said street, and also that the defendants be enjoined and perpetually restrained from constructing and operating their said railway on Holladay street, in the city of Denver.

Mr. J. Q. Charles and Mr. A. C. Phelps, for plaintiffs in error.

Messrs. Sayre, Wright & Butler, Mr. E. L. Smith and Mr. M. Benedict, for defendants in error.

Mr. Justice Stone, having been of counsel, did not sit at the hearing.

Brazee, J.    On the 29th day of June, A. D. 1874, the defendant in error filed its bill of complaint against the plaintiff in error, and the relief prayed for therein was, in substance, that the defendant below be restrained from preventing and obstructing the plaintiff from building, etc., its railway on Twenty-third street, in the city of Denver, and from preventing and hindering the plaintiff from removing obstructions in said Twenty-third street, and from constructing in Holladay street, in said city, or any part thereof, a railway, and from placing ties, rails, and other material on the same ; and from constructing or operating a railway upon any other street, in the complaint mentioned, in the city of Denver.    A temporary injunction was obtained, and by it the defendants were enjoined, substantially, as prayed for in the bill, and enjoined " from building, constructing or operating a street railway on any of the streets of Denver."    The defendants answered the bill, evidence before a master was taken, a hearing was had upon the pleadings and proofs, and a decree entered on the 5th day of February, 1875, by which it was decreed that the injunction heretofore granted in this case be made perpetual.    The complainant became a body corporate under an act of the territorial legislature, which is set out "*in hæc verba*." The act incorporates W. Stimpson and others, as "The Denver Horse Railway Company," and provides that the corporation shall have "the sole and exclusive right and privilege of building, constructing and operating a horse railroad in the city of Denver, and additions thereto.    *

*    *    *    *    *    *    *

And shall have the exclusive right and privilege of building

and constructing along the streets of said city of Denver, railroads, and to run horse cars thereon," and allow the company "to charge each person riding on their horse cars for each passage not to exceed 10 cents." The act goes on to provide certain conditions upon non-compliance with which the exclusive privilege granted is to cease. By an amendment to the foregoing act, the name of the corporation was changed to the Denver City Railway Company. It constructed, equipped, and now has in operation, a horse railway on Champa and Fifteenth streets. On the 18th of June it graded a curve on Twenty-third street, at its intersection with Champa street, and a road-bed on the middle line of Twenty-third street from Champa nearly to Stout street, and laid and embedded ties thereon. When its workmen returned the following morning, they found the ties and rails laid on Twenty-third street had been removed and the grading injured by the defendant, whereby the construction of the road was impeded. They proceeded to repair the damages and continued the work of construction in the same line until hindered and obstructed by another track, constructed by the defendant upon complainant's grade, which the complainant's employees attempted to remove and were prevented by threats and menaces of violence from a large number of defendant's employees, acting by direction of one of the defendants. The title to the streets included in the original congressional grant of a town site for Denver, was conveyed to that city before the 10th of January, 1867, by the probate judge of Arapahoe county, but it does not appear that, as to the streets and parts of streets outside of the congressional grant, the city had any other title than that conferred by the city charter. For the purpose of this action we consider that the Denver and Swansea company was incorporated under the general law of the Territory on the 26th of April, 1873.

The city council of the city of Denver, on the 24th day of April, 1873, passed an ordinance of which the following is the first section:

· "SECTION 1. That the right of way be and the same is hereby granted to H. G. Bond, Miers Fisher and Charles Ruter and their assigns and successors, to build, operate and maintain a railway (to be propelled by dummy engines) adapted for propelling street railway cars, with a single or double track, with the necessary turn-outs or side-tracks, through the following streets in the said city of Denver, and the additions thereto, to wit: Holladay street, Delano street, Thirty-first street, Lawrence street, Champa street, Twenty-eighth street, Fourth avenue, Colfax avenue, Fourteenth street, Fifteenth street, Welton street and Tenth street in Schinner's addition. Provided, nevertheless, that this grant to the said H. G. Bond, Miers Fisher and Charles Ruter is upon this express condition: That they will build culverts at the gutters at each side of street crossings; said culverts to be of such size and dimensions and of such material as shall be designated by the city surveyor of the city of Denver, and to be of sufficient capacity for the complete drainage of all street crossings on the line of said railway, and will also grade the approaches of all streets crossing the line of said railway in a complete and workmanlike manner; the said work to be done under the direction and supervision of the city surveyor."

This ordinance further provided that dummy steam engines should be used for propelling cars, by Bond, Fisher and Ruter; imposed other conditions, non-compliance with which worked a forfeiture of "all rights and privileges" therein conferred and thereby granted, but prescribed no other limits to the enjoyment thereof. Fisher, Bond and Ruter afterward petitioned the city council to add to the right of way granted by the ordinance, Twenty-third and other streets. A committee appointed to consider the petition, on the 5th day of June, 1873, reported that the prayer of the petition be granted, and the report was then adopted by a vote of the city council, and no further action taken thereupon. On the 21st of June, 1873, Fisher, Bond and Ruter assigned all their right, title, interest, privileges and immunities, conferred upon them by the city council, to the

Denver and Swansea company.   On March 5, 1874, the city council extended the time for laying the first mile and a quarter of the track, prescribed in the former ordinance, and required the Denver and Swansea Railroad Company to lay a rail weighing twenty-three pounds to the yard.

The defendants, at the time the suit was commenced, were building their railway on Holladay street, and proposed to build at some time thereafter a line on Fifteenth street, on which the complainant then had a line constructed and in use, and the complainant averred that "if the defendants constructed a road on Twenty-third and Holladay streets it would hinder complainant and cause a loss of business and profits, and the plaintiff would be compelled to bring repeated suits," etc., but it does not aver any facts tending to show in what manner the defendant's railroad in Holladay street would hinder complainant and cause a loss of business and profits, and compel repeated suits.   The respective corporations, which are parties to this suit, by divers allegations seek to dispute the legal existence of each other.   We think these allegations can be more properly determined in a proceeding by or in the nature of *quo warranto*.   A suit in equity between private parties cannot be metamorphosed into an ·inquisition at law, respecting the exercise of franchise in which the parties have no greater right than the citizens generally have in common with them. Besides, these corporations have, by impleading, treated each other, for the purposes of this suit, as legal entities, and for the same purposes, we treat them as they in this respect have treated each other.   Angell and Ames on Corporations, 635–6, and 734.   As to questions, however, arising upon conflicting claims set up by them to the use of the streets of Denver, we may inquire.   Each claims to be entitled to certain rights of way, privileges and franchises, in such streets not common to the public in general, and more or less in derogation of the common right — one claiming, under its charter from the legislature, an exclusive right, the other claiming a similar though not exclusive right, under and by virtue of a grant, from the city council and

mayor of Denver, under the ordinance and proceedings referred to. The rule of construction is well settled and not open to question, that grants of franchises, privileges and powers of the character of those claimed by the parties to this action respectively, are to be strictly construed. This rule is applicable in this case, as well to the municipality of Denver as to the corporations that are parties. The complainant's charter grants to it in terms, " the sole and exclusive right and privilege of building, constructing and operating a horse railroad in the city of Denver, and additions thereto," * * * and " the exclusive right and privilege of building and constructing along the streets of said city of Denver, railroads, and to run thereon horse cars," * * to " level upon said streets a track upon which to build, lay, and operate their said horse railroads," * * and " to charge each person riding on their horse cars " * * " for each passage, not exceeding ten cents." The exclusive right granted by this language is to construct and operate " a horse railroad," " to run horse cars thereon," " to charge fare for riding on their horse cars." The building and operating by steam a street railway in the city of Denver, by an authorized person or corporation, for the purpose of conveying passengers for hire in said city, is not, in our opinion, an infringement of the plaintiff's exclusive charter right to convey passengers in horse cars for a consideration. Were the city council and mayor of Denver authorized to grant the privilege or franchise which the defendants claim, is the next question to be determined. At the time of the passage of the first ordinance, April 24, 1873, under the charter of February 9, 1866, the city council was empowered to " open, alter, abolish, widen, extend, establish, grade, pave or otherwise improve and keep in repair streets, avenues, lanes, alleys, sidewalks, drains and sewers," to "remove all obstructions" therefrom, " prevent and remove all encroachments into or upon all or any streets," and to " make all ordinances " necessary for carrying into effect the powers specified in the act " not repugnant to nor inconsistent with the con-

stitution of the United States, or the organic act of this territory." We must now inquire what powers the government of the United States had invested the territorial legislature with to grant franchise and privilege. By the act of congress of March 2, 1867, the territorial legislature is prohibited from granting private "charters or special privileges," but may, by general incorporation acts, provide for incorporation of bodies corporate for mining, manufacture, and other industrial pursuits; and by the act of June 10, 1872, the territorial legislature may, by general laws, permit corporations to be formed for the construction or operation of railroads, and other purposes not necessary to mention.

The ordinance in question, if within the powers conferred upon the city council by the charter of February 9, 1866, conferred a special privilege upon the persons therein mentioned and their assignees, the Denver and Swansea Railway Company, and in this respect was in contravention of the spirit of the congressional act of March 2, 1867, inasmuch as the power to grant such privilege, if ever possessed by the territorial legislature, had, before the passage of the ordinance under consideration, been taken away by the last-mentioned act. The city council was the creature of the territorial legislature, and we think could not, after the passage of the act of March 2, exercise a greater power in this respect than the legislature which created it. If we are right in this conclusion, the ordinance, in so far as it attempted to confer an especial privilege, was void. We might rest our decision here, but desire to go further and place our decision upon other grounds as well.

On the 13th of February, 1874, the charter of the city of Denver was amended, and in addition to the powers hereinbefore enumerated, the amended charter conferred upon the city council power "to regulate the running of horse railway cars, or cars propelled by dummy engines, the laying down of tracks for the same, the transportation of passengers thereon, and the form of rail to be used."

If it is contended that the action of the city council,

under the charter of 1874, in adopting the ordinance of March 5, at that time affirmed the right of the Denver and Swansea Railway Company in the streets in question, and thereby gave the defendants the rights which they claim to exercise. That position cannot be maintained, for it is apparent that the territorial legislature had not power, after the passage of the congressional act of March 2, 1867, to confer an especial privilege, and of course could not confer the power upon the city council to grant such especial privilege.

That the ordinance in question, taken in all its parts, undertook to confer an especial privilege and franchise, there is not the shadow of doubt. The answer avers that by the proceedings of the city council on the 5th of June, 1873, the "privileges, rights and immunities asked for in said petition were granted, and the rights, privileges, immunities and franchises in said ordinance were extended and made applicable" to Twenty-third street. Such railroad, as the ordinance contemplates, would be a strict monopoly. Persons riding in the cars upon it would be compelled to pay the fare demanded, and its railway track would be for its exclusive use, not admitting of rivalry in the running of cars thereon.

This ordinance then undertook to confer an especial privilege not enjoyed by the people of the Territory in common, and conferred such privilege in perpetuity, for there is no limitation to it in point of time, and no power of revocation reserved to the city council therein. Such a privilege is a franchise. In England the granting of a franchise was a royal prerogative, and could only be granted by the crown, and in the *Bank of Augusta* v. *Earle*, 13 Pet. 595, Chief Justice TANEY says: "Franchises are special privileges, conferred by the government upon individuals, which do not belong to the citizens of the country generally of common right." It is essential that a franchise should be created by a grant from the sovereign authority. It is doubtful whether the legislature can delegate the power to grant such a franchise at all. *People's Railroad* v. *The Mem-*

*phis Railroad,* 10 Wall. 50. In this case it appeared that the city of Memphis had power " to grant privileges in the use and enjoyment of streets," but Justice CLIFFORD says, at page 52, it would be a forced construction to hold that the power to grant a franchise for twenty-five years, as the ordinance under question in that case provided, was included in the corporate power above referred to. It is true, the case was not decided upon this point, but the reasoning of the learned justice is very forcible to show that the ordinance in that case, if perfected, was unauthorized by the charter of Memphis, and therefore invalid. His opinion is entitled to great respect, if not the force of an authority. In the case of *Davis* v. *The Mayor, etc., of the City of New York,* 14 N. Y., the court of last resort in that State held that the city of New York, under its charter, conferring powers quite as extensive as the charter of Denver confers upon its mayor and city council, had no power to pass an ordinance granting a privilege similar to the one under our consideration, and that an ordinance or resolution granting such a right as the defendant claims here, is void. The claim of the defendant cannot be supported upon the ground that, as the owner of the fee in its streets, the city of Denver has the right to grant to the defendants the rights which they claim to have. The streets of New York city are owned in fee by that municipality ; and yet it was decided that it held the streets in trust for the people of the whole State, and not as corporate property. *People* v. *Kerr,* 27 N. Y. 188. The corporate authorities of a city, under such circumstances, have no power to confer such a franchise, and a resolution authorizing it, without limitation as to time or power of revocation, is not a license, merely, but a contract which, if valid, it could not abrogate. *Milhan* v. *Sharp,* 27 N. Y. 611. Upon authority we hold that the ordinance and resolutions in the case at bar were void, and conferred no authority whatever upon the defendant, and cannot be invoked to give them protection. What was the legal character of the acts of the defendants in the construction of a railway in Holladay and Twenty-third

streets? Upon the established facts we must say they create a public nuisance. If authorized by law, their acts might have been justified, no matter how much inconvenience to the public they might have occasioned, but being without right, no matter how little inconvenience this permanent appropriation of a part of the street may occasion, they cannot defend themselves from the charge of nuisance. The authorities for this position are constant and uniform, and leave no doubt on the question. 14 N. Y. 524, and cases cited. On the other hand, the territorial legislature, acting under the general delegation of legislative powers at the time the complainant's charter was enacted, had the authority to incorporate the complainant, and confer upon it, as such corporation, the franchise specified in its charter. The proposition was not controverted on the argument.

In this view of the case, the complainant is entitled to relief just so far as its allegations, sustained by proof, will justify a court of equity in intervening in its behalf. In so far as it suffers from the wrongful acts of the defendants in common with the public generally, it cannot have relief; but, to the extent that its private rights are invaded or threatened by a wrong-doer, it is the duty of the court to protect it. As we have seen, the complaint does not allege facts showing how the defendants' railway on Holladay street will hinder complainant and cause loss of business and profits. For aught we can see, the defendants' cars may, in fact, bring passengers to some of the complainant's lines and thus increase complainant's business and profits. We have searched with diligence the authorities cited and many others, to see whether, under the circumstances developed by the pleadings and the proofs in this case, the injunction, as it respects Holladay street, and other streets than Fifteenth, Twenty-third and Champa streets, can be sustained. The strongest case we have found to sustain the complainant's claim in this behalf is the case of the *Newbury Turnpike Company* v. *Miller*, 5 Johns. Chan. Rep. 101. Under its grant in that case the complainant, as appeared by the allegation and proofs, had, upon complet-

ing a turnpike road between two places more than 12 miles apart, and building in connection therewith a bridge across the Walkill, the right to take toll at the bridge, and the act imposed a penalty upon persons who, having traveled upon the road, should go around the bridge for the purpose of avoiding the payment of tolls. The defendants had built a free bridge within 80 rods of the complainant's bridge, and had constructed a highway from complainant's turnpike to the defendants' free bridge, by which persons traveling on complainant's turnpike could avoid payment of tolls, and upon these facts the court granted a perpetual injunction to protect the complainant in the enjoyment of its franchise. Upon the state of facts in that case it is clear that the complainant would be materially injured by the defendants' highway and bridge furnishing a shunpike, but there are no facts alleged and proved in this case to show that complainant is or will be materially injured by the defendants' road in Holladay street.

Upon the facts appearing in the record the complainant was entitled to relief only as to its lines of road actually built and in operation, and to that end the defendant should have been enjoined from interfering with the road in Champa and Fifteenth streets, and from opposing the construction of complainant's road in Twenty-third street, and not otherwise, and the decree of the court below will be so modified.

*Decree modified.*