### FINANCIAL INTEREST OF MAYOR IN STREET RAILWAY.

Common Pleas Court of Cuyahoga County.

CLEVELAND ELECTRIC RAILWAY v. CITY OF CLEVELAND.*

Decided, December 7, 1916.

*Municipal Corporations—Street Railway Grant Rendered Invalid by Financial Interest of Mayor—Collateral Attack on Grant to Street Railway.*

1. Where the mayor of a city allows himself, from whatever motive, to become so identified with the building of a street railway that his pecuniary interests will be promoted by obtaining advantageous grants from the city for the company, such grants are corrupted and must be treated as void.

2. While as a general proposition corporate existence can be questioned only by the state and in a direct proceeding for that purpose, and where the validity of a contract made by the city is questioned in the interest of the public the attack must be made by those legally representing the public, nevertheless where such a contract is relied upon to justify interference with private property of one not a party to the contract, its invalidity may be asserted by the company, not for the undoing of the contract, but for protection of its private rights.

PHILLIPS, J.

Heard on demurrer and motion to strike out.

A demurrer to the petition in the case of the Cleveland Electric Railway Company against the city of Cleveland and others, No. 99073, and a motion to strike out parts of the second amended petition in the case of like title, No. 98522, present for determination the legal effects of certain grants from the city to the defendant, the Forest City Railway Company.

Two principal questions concerning the contracts resulting from said ordinances and their acceptance by the company were presented in argument:

*Action dismissed without record at plaintiff's costs.

First, conceding the truth of what is properly alleged as to the personal and financial interest of Mayor Johnson in said railway company, are said contracts thereby invalidated?

Second, conceding that said contracts are so invalidated, can such invalidity be asserted by his plaintiff for the protection of its private property rights from interference by the Forest City Company, threatened under claim of right of interference given it by the city in and by such invalidated contracts?

While the property rights of the plaintiff are not very artfully stated in one of the petitions, I think it fairly appears that plaintiff owns and operates a system of electric street railways in numerous streets of the city, and that it maintains its tracks and their accessories by virtue of grants from, and contracts with, the city.

Stated compendiously, the petition alleges, and the demurrer admits, that the defendant railway company, in the construction of a like system of railways, threatens to interfere with plaintiff's track in some of the streets, and to make a joint use thereof with the plaintiff; that it justifies such interference with, and such joint use of, plaintiff's property by virtue of certain enabling ordinances of the city; that the mayor of the city, having a personal financial interest in the defendant company, procured the passage of such ordinances, and in divers ways promoted the interests of the defendant company, and that the defendants all the while knew of his personal financial interests in the company, and of his personal and official efforts to promote its undertaking.

The ordinances relied upon by the defendant railway company, are, briefly, as follows: September 9, 1903, an ordinance granting to Albert E. Green the right to construct, maintain and operate a street railway in Denison avenue. This ordinance was accepted by Green, and by him assigned to the Forest City Company; December 21, an ordinance was passed granting an extension to said Green, and right to the joint use of some of plaintiff's tracks, and fixing the compensation to be paid, in case of disagreement. This was accepted by Green, and there-

after assigned to the Forest City Company; September 4, 1906, an ordinance granting an extension to the Forest City Company, and right to the joint use of certain of plaintiff's tracks, wires, poles and so forth. This was accepted by the Forest City Company; September 24, 1906, two like ordinances were passed and accepted by the company.

It is alleged in case No. 99073, that shortly after his election Mayor Johnson undertook to obtain from the city franchises for a street railway, and that pursuant to such purpose, he procured said Green to make application for a franchise in Denison avenue; that the establishing ordinance was passed by his procurement; that he procured Green to apply for the extension of December 21, 1903; that by his procurement said extension ordinance was passed by the council; that he procured the incorporation and organization of the Forest City Railway Company, and caused and procured Green to assign his said rights to that said company; that by Johnson's procurement, the extension ordinance of September 4, 1906, was passed; that by his procurement, and in furtherance of his general purpose of promoting said street railway, the ordinances of September 24, 1906, were passed.

In the second amended petition, in the other case, it is alleged that Johnson entered into a conspiracy with sundry other persons to obtain from the city said franchise for a street railway, in which grants, so to be procured, he was to be financially interested.

These charges of the personal and financial interest of the mayor in the railway company with which the city was contracting, and the knowledge thereof by the company being admitted by the demurrer, let us see what is the legal effect of such state of facts.

In the whole realm of jurisprudence no principle is better established or rests on firmer foundation, than the one which forbids one occupying a fiduciary relation from placing himself in any degree in antagonism to his trust. Agents, guardians, executors, directors of corporations, officers of municipalities, and all other persons clothed with the fiduciary character, are subject to this rule.

And this rule is accentuated in its application to the officers and agents of municipal corporations. The reason and propriety for accentuating this rule in its application to public officers are at once plain and strong. A public officer is one to whom is delegated some of the foreign functions of government, to be exercised by him for the public benefit. He acts only for the public; and the public are represented, in the instance, only by him; and the theory upon which his acts bind the public, is that his acts have the public sanction, because they are exclusively in the interest of the public. When the public officer acts, in any measure, for his own interests, and, hence, in the same measure against the public interest the public sanction is wanting, and the public may not be bound. A reason for accenuating the rule in its application to officers of a municipal corporation, is thus stated by the Canadian Court of Chancery.

I read from 4 Grant, 507, a single paragraph:

"If this rule be one of pressing necessity in cases of ordinary trust, why is it to be abrogated where the trusts are of such vast magnitude and importance? Why is the principle to be held inapplicable when the probabilities of an abuse of trust are so greatly multiplied? Such a determination in a country, the local concerns of which are managed to so large an extent by corporations of this sort, possessed of such extensive powers, would be productive, in my opinion, of the worst consequences to the moral and material interests, of the community."

I read the statement of the general doctrine from *1 Dillon, Munic Corp.*, Section 444:

"It is a well established and salutary rule in equity that he who is entrusted with the business of others can not be allowed to make such business an object of pecuniary profit to himself. This rule does not depend on reasoning technical in its character, and is not local in its application. It is based upon principles of reason, of morality, and of public policy. It has its foundation in the very constitution of our nature, for it has authoritatively been declared that a man can not serve two masters, and is recognized and enforced wherever a well regulated system of jurisprudence prevails. One who has power, owing to the frailty of human nature, will be too readily seized

with the inclination to use the opportunity for securing his own interest at the expense of that for which he is entrusted. It has therefore been said that the wise policy of the law has put the sting of disability into the temptation as a defensive weapon against the strength of the danger which lies in the situation. This conflict of interest is the rock, for shunning which the disability under consideration has obtained its force, by making that person who has the one part entrusted to him incapable of acting on the other side, that he may not be seduced by temptation and opportunity from the duty of his trust. The law will in no case permit persons who have undertaken a character or a charge to change or invert that character by leaving it and acting for themselves in a business in which their character binds them to act for others. The application of the rule may, in some instances, appear to bear hard upon individuals who had committed no moral wrong; but is essential to the keeping of all parties filling a fiduciary character to their duty, to preserve the rule in its integrity, and to apply it to every case which justly falls within its principles. The principle generally applicable to all officers and directors of a corporation is that they can not enter into contracts with such corporation to do any work for it, nor can they subsequently derive any benefit personally from such contract. To deny the application of the rule to municipal bodies, would, in the opinion of the Canadian Chancery Court, be to deprive it of much of its value; for the well working of the municipal system, through which a large portion of the affairs of the country are administered, must depend very much upon the freedom from abuse with which they are conducted. It is obvious that nothing can more tend to correct the tendency to abuse than to make abuses unprofitable to those who engage in them, and to have them stamped as abuses in courts of justice. The tendency to abuse may indeed be in part corrected by public opinion; but public opinion itself is acted upon by the mode in which courts deal with such abuses as are brought within their cognizance. It has been well observed that the view taken by courts of equity with respect to morality of conduct among all parties is one of the highest morality; and this can not fail to have a salutary effect on public opinion iself. Just as, on the other hand, if a low standard of morality were presented by the courts, its inevitable tendency would be the demoralization of the public feeling in regard to transaction of a questionable character.''

*Mechem, Pub. Off.*, Sections 368, 369, says:

"Any contract * * * which naturally and legitimately tends to induce a public officer to neglect, ignore, violate or exceed his official duty, or to make him less zealous, earnest or diligent in its discharge, * * * is contrary to public policy and void. * * *

"Any contract by which a public officer imposes restraints or creates obstructions to the future impartial and untrammeled discharge of his duty, are void."

I read an excerpt from *People* v. *Overyssel*, 11 Mich., 222, 226:

"All public officers are agents, and their official powers are fiduciary. They are trusted with public functions for the good of the public; to protect, advance and promote its interests, and not their own. And, a greater necessity exists than in private life for removing from them every inducement to abuse the trust imposed in them, as the temptations to which they are sometimes exposed are stronger, and the risk of detection and exposure is less. A judge can not hear and decide his own case, or one in which he is personally interested. He may decide it conscientiously and in accordance with law. But that is not enough. The law will not permit him to reap a personal advantage from an official act performed in favor of himself. * * *

"We think it no exception to the rule we have stated, that all the contractors were not members of the board of freeholders, or that those who were members were a minority of the board. The rule would not amount to much if it could be evaded in any such way. It might almost as well not exist, as to exist with such an exception. The public would reap little or no benefit from it."

And again, on page 228:

"And, though these contractors may, as members of the board, have acted honestly, and solely with reference to the public interest, yet, if they have acted otherwise, they occupy a position which puts it in their power to conceal the evidence of the facts, and to defy detection. If, therefore, such contracts were to be held valid, until shown to be fraudulent or corrupt, the result, as a general rule, would be that they must be enforced in spite of fraud or corruption. Hence, the only safe rule in such cases, is to treat the contract as void, without reference to

the question of fraud in fact, unless affirmed by the opposite party. This rule appears to me so manifestly in accordance with sound public policy as to require no authority for its support.''

I have read from the opinion delivered by Judge Manning, of Michigan.

A brief extract from the opinion in the case of *Grand Island Gas Co.* v. *West*, 28 Neb., 852, 855.

''That an agent can not act in a double capacity is elementary. The fact that the principal is a municipal corporation, instead of a natural person, does not change the rule. The obligations and duties resting on a member of a city council are of such a character that he will not be allowed to reap any advantage his position may give—to speculate at the expense of the municipality. He must act solely for the welfare of the city. The temptation would·be great to abuse the confidence reposed in him by the people if allowed to contract with it.''

To the same effect is the language of the court in *Smith* v. *Albany*, 61 N. Y., 444, 445, which I will not take the time to read. And in *Findlay* v. *Parker*, 17 C. C., 294, a case decided by one of our circuit courts, of which Judge Price, later of the Supreme bench, was a member, and the opinion is this:

''When a municipality is allowed to embark in a business enterprise such as operating a plant to furnish its inhabitants with light and fuel, and to carry on the business of buying and selling gas where of necessity the conduct and management and control of the business is in the hands of those who are not personally interested in the assets of the business, who take no part in its savings, who pay no part of its liabilities; who are strangers to its profits, and not directly affected by its expense, the necessity of every safeguard is most apparent. Those who conduct the business and control it may not directly or indirectly both buy for it and sell to it either material or labor, and this however honest and competent may be the one who thus serves it. And an officer of a municipal corporation who has retired from the office to which he has been selected or appointed, may not·be interested, either directly or indirectly, in any work or service for said corporation, until the expiration of one year after his retirement from office.''

This is by virtue of a statutory provision.

"He may not direct or control its future policies while in office, and then upon retirement stand ready to acquire as an individual the harvest which he has hoarded as a public officer, and this however honest he may be, and however competent."

In few cases decided by our Supreme Court, this doctrine has been fully recognized. Justice Storey has said:

"It is by no means necessary in cases of this sort, that the agent should make any advantage by the bargain. Whether he has or not, the bargain is without any obligation to bind the principal."

The rule I have been considering is so familiar to the profession as not to need the citation of authorities for its existence, but I have cited these authorities, and others could be cited *ad infinitum*, to show how firm its foundation, how broad its scope, the tendency of the courts to widen rather than to narrow its application, and the care with which the courts have guarded the rule from innovation, exception, or modification.

As a conclusion upon this branch of the case, I must find that the relation which Mayor Johnson sustained towards the city and towards the street railway enterprise were in direct antagonism. As mayor of the city, he was officially a party to the several contracts with the railway company, and fidelity to the city forbade his being personally interested, directly or indirectly, in the welfare of the company, in the obtaining of privileges from the city.

That he was so interested the facts here admited can leave no doubt. He conceived, initiated and promoted the whole scheme of building and operating a system of three-cent fare railways in this city. He procured a Mr. Green to make application for a grant from the council. He procured the council to make two successive grants to Green. He procured the incorporation and organization of the Forest City Railway Company, and then procured Green to assign his rights to that company. He procured the council to make further grants to that company. He

assumed secondary liabilities for payment for rails, cars and other equipments for the road. He assumed liabilities as to paving, etc., in order to obtain consents of property owners. He was active in securing consents, and but for his activity in that regard, enough consents would not have been procured. He procured the incorporation and organization of the Municipal Traction Company, to which the road has been leased. Mr. Johnson, together with one E. W. Scripps, entered into an agreement in writing, whereby they obligated themselves to subscribers to the stock of the Forest City Railway Company to indemnify them against loss on their stock. By this intemnity undertaking, Johnson and Scripps bound themselves to purchase from the subscribers their stock within a fixed period, at the option of the stock subscribers, and to fully protect them from loss; and in pursuance of said agreement and undertaking, many thousands of dollars of the stock have been sold, thus fixing additional liability of Johnson and Scripps if that undertaking is legally valid.

There are averments in these petitions, that Mayor Johnson is financially interested in this enterprise which he has fostered, but lest these may not be well pleaded, I have placed no. reliance upon them.

While the mayor's zeal and activity in securing additional and cheaper transit for our people should be commended rather than condemned, when he allows himself, from whatever motive, to become so identified with the enterprise that his pecuniary interests will be promoted by obtaining advantageous grants from the city for the company, such contracts are corrupted and invalidated, and are void. When, in promoting and in financing the company, Mayor Johnson assumed liabilities that were contingent upon the financial success of the company, he had a personal interest in its success. It was indispensable to the success of the company that it should obtain extensions of its lines on terms favorable to the company. In this regard Mr. Johnson's personal interest was identified with it, and this placed him in direct antagonism to the interests of the city, which it was his official duty to protect and promote. The statute provides

that no street railway, or extension thereof, can be constructed within a municipality, unless the right to do so be first granted by the municipal corporation, and by ordinance. The council is to prescribe, by ordinance, the terms and conditions upon which, and the manner in which, the road shall be constructed and operated, and the council is to designate by ordinance the streets to be occupied and used. Notice must be published, bids must be invited, with fair chance for competition; consents of property owners must be had; paving and repair of streets may be required of the company; the rate of fare is to be fixed, etc., and the statute repeatedly says that in the consideration and disposition of these matters the officials shall have in view "the benefit, convenience and advantage of the public."

In these matters the council is required to act by ordinance, and these ordinances must be presented to the mayor, and must have his approval before they can go into effect.

When a right is to be granted to construct or to extend street railway, the council is confronted with consideraions of much concern to the people and the municipality. Street railways are at once a convenience and an inconvenience, and they are a source of danger. Perhaps nothing of greater concern to the people and to the municipality ever engages the consideration of the council; and the same weighty problems confront the mayor when the ordinances come before him for approval.

In the consideration of such questions, these officials, clothed with such powers, and charged with such duties, should be free from improper impulses, or restraint, or embarrassment. In the language of our Supreme Court, "The public, for whom they act, have the right to their best judgment, after free and full discussion and consultation upon the public matters entrusted to them." *McCortle* v. *Bates*, 29 Ohio St., 419, 422.

Can this right of the public, can the public welfare, be conserved if these officials, one or all of them, are interested in the financial welfare of the railway company with which they are dealing? To make the matter clear, let us intensify the situation: Suppose the mayor and all the councilmen should organ-

ize and own a street railway company; suppose that they should own all its stock and that from their number were chosen all of its directors and other officials and agents; and suppose that these persons, in their capacities as city officials, should make a contract with themselves in their capacities of street railway officials, granting to such company railway rights in some of the municipal highways; would any one doubt the utter invalidity of such grant? Could any legal effect attach to the action of city officials where there is such clear antagonism of interest and of duty? Could such railway company have the ear of the chancellor for a moment in respect of alleged rights so obtained? And why not? The contract so made by such persons, *inter se*, might be entirely fair—might even be advantageous to the city; and I suppose that, strictly speaking, such grant by the city officials would be *intra vires*. Its invalidity would not come from want of corporate capacity—it would come from the virus of corruption and fraud, from dereliction of official duty, from bad faith in a trust relation; from antagonism of personal interest and fidelity to the public interest. Such transaction would contravene public policy, which Greenhood, Public Policy, says is a principle of the law which "Secures the people against the corruption of justice or the public service, and places itself as a barrier before all devices to disregard public convenience."

In the case I have supposed, if only one, or a part, of the city officials was identified with the railway company, the difference would be one of degree, and not of principle.

I come now to the second of the two principal questions presented in argument, that is, can the invalidity of the contract be asserted by this plaintiff for the protection of its private property rights from interference by the Forest Company under claim of right of interference given it by the city, in and by such invalid contract?

While in the argument this action was treated as a direct and affirmative attack upon certain ordinances and the contracts resulting from an acceptance thereof, and nearly all he authorities cited in support of the demurrer, were to the point

that these ordinances and these contracts, like questions as to corporate existence, are immune from attack at the suit of an individual for the conservation of private right, I think that is not the character of this action, as will appear by some careful attention to some well known rule of procedure.

All of this petition that relates to the grounds upon which the defendant railway company claims right to joint use of plaintiff's road, and all that relates to this invalidity of such claim, is improperly in the petition. These allegations do not make for the plaintiff in the first instance. All that is requisite, and all that may properly be alleged in the petition, is a concise statement of the plaintiff's property right, and the defendants' threatened interference therewith, and that such proposed interference is without legal right or authority. The ordinances conferring rights upon the defendant make for the defendant, and should be pleaded by it in justification; and the facts, alleged to show the invalidity of these grants, are proper matter for reply to such answer, and should be so pleaded by plaintiff in avoidance. Under the old system of pleading in equity these allegations would be proper in the charging part of the plaintiff's bill, which supplied the office of a reply under our reformed procedure. The charging part of the old bill in equity alleged the pretenses which the plaintiff supposed the defendant would set up as a defense, and then charged other matter to disprove or avoid them. Under the reformed procedure this is anticipating and avoiding a defense, and is not allowable.

In one of these cases, No. 98522, there is a motion to strike out a part of this matter. This motion does not state for what reason, or on what ground, the matter sought to be stricken out, is objected to. I suppose that is a mere slip of the counsel; but assuming it to rest upon the statutory ground of redundancy and irrelevancy, I should say it is well taken, and should be granted, unless for one reason, now to be stated: This motion does not attack the allegations of purely defensive fact, but seeks to have only the facts in avoidance thereof stricken out, leaving the defensive allegations standing. This would emascu-

late the petition, and would put the plaintiff at an unfair disadvantage.

The matter I think is improperly in the petition is the statement of the various ordinances under which the defendant claims the right of interference, and such statement of those ordinances shows such right—standing alone—shows such right in the defendant. Then there are added sundry allegations of fact to show the invalidity of such ordinances, because of the financial interest of the mayor in the company, to whom the grants were made; that that part of the petition is an avoidance of the facts under which the defendant is alleged to claim the right of interference. Well, now, this motion to strike out attacks only this matter in avoidance, only these allegations of financial interest. Were they stricken out, and the allegations concerning the ordinances and their acceptance left standing in the petition, the petition would then show a clear right in the defendant to make the interference thus threatened. All of this matter is improperly in the petition, and all might go out if included in a motion.

So long as the purely defensive allegations remain in the petition, and remain there with the concurrence of the defendant, the allegations in avoidance thereof should remain with them. It is clear that all these allegations were inserted in the petition only to make available the facts alleged in avoidance; and that the facts defensive in their nature were pleaded only to make way for the matters in avoidance—as a sort of inducement thereto. It is now sought to dissever these groups of ·dislocated allegations, not to relieve the record, or to purify the pleadings, but to obtain advantage by striking out the one group, and leaving the other, which is equally vulnerable.

I am inclined to refuse this motion rather than to allow it to serve a purpose not intended by motions to strike out improper averments. So long as the purely defensive averments remain in the petition, and remain there with the concurrence of the defendants, I think the matter asked to be stricken out should remain; because this motion is relevant to the defensive

matter in the petition. So long as the defensive matter remains, this matter in avoidance thereof is material to a statement of the plaintiff's right of action, as they undertake to state it, so for that reason, this motion·will be refused. If the motion embraced all of this matter, the matter that is purely defensive, as well as the matter in avoidance thereof, I think it is clear that the motion should be granted, although I gave them leave to amend this petition, and insert this matter in it. It was done without consideration of it, and done at the suggestion of counsel, that unless this distinct right of action based upon the mayor's financial interest were embraced in that case, that that case should go to judgment without the matter embodied in it, it might be an adjudication of other rights so omitted from it, and upon that suggestion, and without consideration, and I believe with very little objection, if any, leave was given to amend the petition and bring that matter into it. I am satisfied that on the consideration of it, it was improperly in it. It belongs to the case, but not in the petition. Part of it should be in answer and part of it in reply.

In the other case, No. 99073, there is a special and a general demurrer to the petition. Inasmuch as the defendants have not, in this case, questioned the propriety of any averments of the petition, but have challenged their sufficiency, admitting for the occasion, that they are true, I have treated them as properly in the petition, and have considered only the questions of their legal operation and effect.

It was urged in argument that corporate existence can not be attacked collaterally—that a private party, suing or defending in his own interest, can not question the sufficiency of proceedings to incorporate. It is true, as a general proposition, that corporate existence can be questioned only by the state, and only in a direct proceeding for that purpose. Whether a certain association of persons, have been invested with certain privileges by the state, or, if so invested, whether they have forfeited the right to exercise such privileges, are questions that concern the state, and not individuals—it is a public question.

It is likewise true that when the validity of a contract made by the city is questioned, in the interest of the public, the attack must be made by those legally representing the public—such attack can not be made by a private party, suing or defending in his own private right.

But here the analogy ends. When such contract is relied upon to justify interference with the private property of one not a party to the contract, its invalidity may be asserted, not for the undoing of the contract, which is a matter of public concern, but for the protection of the private right, specially affected thereby.

The irregular way in which the question as to the validity and sufficiency of the defendant's alleged authority is presented by the pleadings, gives an appearance of attack upon the ordinances, at the outset of the action, and as the primary purpose of the suit. This is not the real situation. If this claim of invalidity were presented by pleadings in strict conformity to the logic of procedure, and the rules of pleading, as I have before shown these to be, it would then be plain that the object of the suit is the protection of property rights, and that the claim of invalidity of contract is a challenge of the validity and force of an asserted justification of proposed interference.

If this petition stopped with a statement of the plaintiff's right, and the defendants threatened wrongful interference, and if the defendant railway company were here justifying by showing a contract in terms authorizing such interference, but admitting that it was the fruit of corruption and fraud on its part, would it be claimed that it could have the ear of the chancellor? It must be remembered that it is not the corruption of a city official alone that is asserted here, but that of the defendant railway company as well; for it is alleged in the petition, and admitted by the demurrer, that the defendant had all the while full knowledge of the mayor's financial interest in that company.

It was the burden of the arguments in support of the demurrer, that the right of the Forest City Company to exercise

its franchise acquired from the city is not subject to collateral attack at the suit of a private party. I think I am in full accord with this proposition. It is held by the circuit court of this circuit, in *State* v. *Railway,* 6 C. C., 318, that a grant by a municipality to a company to construct and operate a railway in the streets is a franchise, emanating from the sovereign power, and the same is held by other courts. One case is *Denver & S. Ry.* v. *Railway,* 2 Colo., 673. I have noticed a similar holding in other cases that I have not noted. It is a sound doctrine recognized in Ohio and generally, that the grant of such right to use the streets of a municipality, is a franchise; that is, it is a privilege that comes from the state through the instrumentality of the city, and therefore, it is as immune as any other franchise emanating from the state.

The general proposition that a franchise—a special privilege and power conferred by the state, is immune from collateral attack, is shown by such array of authorities cited by demurrants, and is so well settled that I need not dwell upon it or refer to the authorities.

If I have reasoned rightly as to the nature of these actions, and, as to the construction of these petitions, these actions are not, in the first instance, an attack upon the franchise rights of the Forest City Railway Company. The attack upon the franchise right claimed by the defendant is not in support of plaintiff's asserted property right, but is purely and only in refutation of defendant's asserted right of interefence with plaintiff's property. The statement of plaintiff's property right needs not to be forfeited by setting out some supposed ground of interference therewith relied on by defendant, and then showing the invalidity of such supposed ground of interference. The plaintiff's right is not at all fortified in such way. But the defendants, by demurring to this over full petition, this *omnium gatherum,* if I may so characterize it—virtually say: "For the purposes of this demurrer we are satisfied with your statement of your primary right, and with your statement of our ground of justification; but we challenge the legal sufficiency of the

facts stated by you in refutation and avoidance of our justification.'' And this is the only question that has been argued; and the decision of this one question decides the. case. Since the defendants have chosen to treat the petition in this way—the court has so treated it. It must be an incontrovertible proposition—I know it is one that the courts have gone great lengths to maintain—that courts will not lend their aid to a claim or a defense that has its inception and its fulfillment in corruption or fraud.

If I am right in holding that the facts alleged in the petition show official corruption, and this participated in by the defendant railway company, then it seems to me the attitude of the defendant is this:

''We admit plaintiff's primary right; we admit our intended interference with that right; and we justify by a show of authority corruptly granted, and as corruptly received—authority obtained in a transaction that was conceived and consummated in official corruption, and we were parties to the corruption; but here are some technical forms of procedure, some legal formalities, that make this corrupt transaction immune.''

And this in a court of equity, whose conspicuous function is to look beyond the form and into the substance of the transaction.

It was suggested in argument that inasmuch as the city had the corporate power and the legal right to grant the privileges in question, *ergo,* the grant is immune and valid. If this were the law, then all the legitimate powers of the municipality might be exercised corruptly, and all its acts be valid, though all corrupt. The suggestion in argument loses sight of the trust relation involved. The power of the city to make such grant, is a delegated power, and is held in trust. The city officials are the constituted agencies for the performance of its trust obligations. When they are recreant to the trust, and deal with the party who is cognizant thereof, and is therefore *particeps criminis,* nobody is bound, and the transaction is a nullity.

In the case in the Supreme Court of Maine, where a tender of merchandise in performance of a contract was relied on, but

the property tendered did not conform to the requirements of the law to render it merchantable, the court said:

"He could not plead a performance which involved a palpable violation of the law."

It seems to me that this is the attitude of the defendant in this case. That the plaintiff owns its tracks, and has a property right in that part of the streets which is actually occupied by its tracks, and that the rights will be protected by injunction, are propositions that are settled by our Supreme Court, by a decision in *Hamilton, G. & C. Trac. Co.* v. *Transit Co.*, 69 Ohio· St., 402. This shows that the primary right asserted by the plaintiff will, in proper action, be protected from wrongful invasion.

That the plaintiff would suffer special inconvenience and injury not common to the public, from the threatened interference with the private property right, and that the threatened injury is in terms authorized by the grants herein held to be invalid and void, are propositions so obvious as not to require any discussion. This shows that the threatened interference is wrongful in the sense that it is unlawful.

This petition, stating a legal primary right in the plaintiff, and threatened wrongful invasion thereof by the defendant railway company, it does state a right of action in this plaintiff, and against the defendant railway company.

But it is claimed that this plaintiff can not sue this defendant for the protection of the plaintiff's right from the defendant's wrongful invasion thereof. Bearing in mind that such right may be protected by injunction, who, let me ask, should bring an action—who should invoke the action of the court but the party whose right is threatened, and who is entitled to protection? And who, may I inquire, should be sued but the party threatening the wrong, and whom it is sought to bring within the operation of the court's order, if one is to be made in the case?

In response to this, it may well be suggested that since the alleged delict is an act authorized by a franchise conferred by the state, through the city, it must further be made to appear

that the validity of such authority may be assailed in this indirect way.

In answer to such suggestion, I have already shown, I think, that where such franchise is obtained corruptly, it binds nobody and empowers nobody, and is not immune from attack whenever and however asserted.

If, however, I am wrong in holding a franchise so obtained to be thus vulnerable, our Supreme Court has announced a doctrine that clearly sanctions the kind and extent of attack sought to be made in this case. I refer to *Zanesville* v. *Gas-Light Co.*, 47 Ohio St., 1; *Gas-Light Co.* v. *Zanesville*, 47 Ohio St., 35. These two cases were brought and tried and determined while I lived at Zanesville, and I am quite familiar with them. Indeed, one of them came before me after I went upon the bench. There was a controversy between the gas company and the city as to which should fix the price of gas furnished to and consumed by the city. The company claimed that it had the right under its charter to fix the prices within certain limits. The city claimed that it had the power under its charter, under statutes that were binding upon the company, to fix the price, and it did fix the price. The city refused to pay the price required by the company, and the company refused to furnish gas at the price fixed by the city, and there was some violence used in regard to the posts of the lighting company, and some pipes were cut, and it resulted in the bringing on the same day of an action by the city to restrain the company from withholding its gas, and interfering with its own pipes for that purpose, and an action by the company to restrain the city from using the gas unless it agreed to pay the price fixed by the company. The cases both went to the Supreme Court. The second paragraph of the syllabus in the first case, I should say that there was involved in the contention the question of corporate power, either in the city, or perhaps, in the company, perhaps in both, I don't now recall it—the second paragraph of the syllabus in this case is this:

"Whenever an incorporated company, in any action, asserts a right against another person, based upon an assumed fran-

chise or power, the person against whom the right is so asserted, may, as a defense, deny the existence of such franchise or power."

And on page 29, Minshall, Chief Justice, uses this language:

"It is open, at all times, to the person against whom a corporation may claim the right to exercise a power to call the power in question, and to require the company to show the existence of the power, by deriving it either from the plain terms of its charter or the statute under which it is organized. Such a determination is an adjudication upon the question as between the parties to the suit, but does not operate as a judgment of ouster. It may still claim and exercise the right as to other persons, as if such judgment had never been rendered. Not so as to judgment of ouster in *quo warranto*. In such case, the proceeding being at the suit of the state, the judgment is available to all persons as an adjudication upon the question."

The case of *The Lehigh Coal & Navigation Co.* v. *Railway*, 167 Pa. St., 75, was a bill in equity to restrain the construction of an electric railway on a public road between two boroughs. The defendant claimed the right to use the public highway through Rahn township, by virtue of a consent obtained from the proper official, one Coll, the supervisor of the township. The defendant had procured this consent by agreeing with Coll that it would give him and his son employment so long as the father should live. He was the proper officer to give the consent to occupy the highway through the township, and the consent had been procured, and in the way that I have just stated.

The plaintiff was under contract with the township authorities to keep the roads of the township in repair and in safe condition. There was a statute authorizing the township authorities to let by contract the maintenance of the public roads within the township, and this plaintiff had such contract. The trial judge dismissed the bill on the ground that the decree prayed for would prevent the construction of the road—that is the street railroad—and would practically be a repeal

of the defendant's charter. In the Supreme Court this view was urged by the defendant, and it also claimed that the status of the plaintiff gave it no right to maintain such action. The plaintiff claimed that the arrangements between the defendant and Coll was bribery, and rendered his official act inoperative, and that the defendant, in the attempt to use the public highway in the construction of its road, was a trespasser. The Supreme Court reversed the judgment of the lower court, and ordered an entry of a perpetual injunction. As to the claim that an injunction would practically work a repeal of the company's charter, the court said that such would not be its effect, but that the operation of such order would be to limit its action to what was authorized by its charter. The court concluded its consideration of this claim with the pungent suggestion that, "The trouble such companies encounter grows out of the circumstances that they consult their chartered rights less than their pecuniary interests.

As to the claim that the consent obtained from the township supervisor was inoperative, the court said:

"This agreement was not between the township and the railway company, but between Coll as an individual and the company, by which the company undertook to pay the individual for his action as an officer. The plain import of the agreement was this: if the supervisor of Rahn township would give consent on behalf of the township to the occupancy of its public roads by the defendant street railway, then the company would pay the man who held the office the price he demanded for his official action. The privilege bargained for came from the township. The price of the privilege went to the man who held the office and enabled him to control the privilege * * * this was a very plain case of bribing a public officer. A consent so obtained, if otherwise valid, would confer no rights on those who bought it. The contract which was given for it was as utterly worthless as the consent. Neither the buyer nor the seller took anything by their bargain, nor did the township, against which both seller and buyer were contriving, lose anything by the transaction. Its consent has not been given, and can not be obtained in the way in which the paper, called a 'consent' in this case, was secured."

As to the claim that the status of the plaintiff company did not authorize it to sue, the court said:

"A corporation which has assumed the duty of making and repairing highways, under the provisions of the act of June 12, 1893, P. L., 451, has a standing in a court of equity to object to the construction of an electric railway upon one of the highways it is bound to keep in repair."

The synopsis of the brief of counsel in that case shows that the argument of counsel for the defendant brought the court for its consideration several of the points that are here urged and chiefly relied upon.

The doctrine of this decision was plainly this:

First, an electric railway may rightfully be constructed in a public highway only when the proper legal custodians of the highway have properly and legally consented to such use of the highway.

Second, when such consent has been obtained by corrupt means, it authorizes nobody, and it binds nobody.

Third, when a pretended consent is a nullity, there is no consent, and one whose contract rights are to be affected by a threatened unauthorized construction and use, may maintain an action for the protection of his rights by injunction.

There is striking similarity between this Pennsylvania case and the case in hand. The plaintiff company sued in its private right, and not as representing the public. The plaintiff's right grew out of contract. The right asserted by the defendant company was a franchise right, and was obtained and held under color of authority; and the ground of attack was corruption in a public official. And the case stands well within the rule laid down by our Supreme Court, *Zanesville* v. *Gas-Light Co., supra,* in that the plaintiff was resisting and challenging the right of a corporation to exercise an apparent and colorable corporate power.

Another view of this case has occurred to me, in the consideration of the case. It is this: It must be assumed that the plaintiff has its property in the streets by virtue of a contract

with the city. It may also be assumed that this contract is for a specified term, not yet expired. Such contract is binding upon the city, as well as upon the plaintiff, until it has been fully performed, at the expiration of its term. Whatever right the city may have, by law or by the terms of its contract to incumber the plaintiff's tracks, there must be, at least by implication, an obligation—a contractual obligation—not to encumber them by corruptly procuring and empowering another to make joint use of them. For while this defendant company has been created, and grants thereto have been made, by the procurement of the mayor, urged thereto by his personal financial interest in the enterprise, *non constat* that such grants would have been made without such wrongful procurement.

Is not this such breach of contractual obligation as gives the plaintiff a right to maintain this preventive action?

I had in mind, what I have not very well expressed by what I have said, that there must be good faith on the part of the city in carrying out this contract with the plaintiff company. That whatever right or power the city has to encumber the plaintiff's tracks, and this power and right with or without contract, must be exercised in good faith. That must be an implication of the relation between them. And now, when it is conceded under the construction that must be put upon things here, that here is a corrupt and fraudulent imposition upon the plaintiff's tracks, it is a breach of the good faith that rests upon the city in carrying out that contract while it is in existence. And that, it seems to me, would give a right of action against the city and against the defendant railway company that is now proposing to interfere with the plaintiff's tracks under the license of grant from the city. That occurred to me, and I suggest it.

Another view that occurred to me: I think there is no allegation in either of these petitions, that there is no contract right in the city as against this plaintiff to grant to another company a joint use of its tracks. I have not examined this petition with a view to that matter, but I have read them

several times for other purposes. My recollection is that there is no such averment in them. That matter came up in the hearing that was had in one of these cases on the motion for a temporary order, that was brought into the case by evidence.

Now, then, in the absence of any contract right on the part of the city to impose this burden upon the plaintiff's track, it would still be within the province of the city to grant the privilege of using those tracks, so far as it concerns the public highway, but before the right to make such actual use of the track would accrue to the defendant company, the right as against the plaintiff company would have to be obtained by appropriation. There is no full right of actual occupancy, joint occupancy, of the tracks, until there has been, in addition to the consent of the city, an appropriation, or until something had been done under contract, which is equivalent to an appropriation. And now, isn't the plaintiff company entitled to an injunction to restrain actual interference and occupancy until there has been an appropriation, no contract right of the kind I speak, appearing in the petition? If that be so, then this demurrer should be overruled on that ground.

The motion to strike out, as I said, will be overruled. The demurrer to the petition in the other case will be overruled.